UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE**
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ  07101-0419
(973) 645-6340



**WILLIAM J. MARTINI**
       **JUDGE**

## LETTER OPINION

November 30, 2010

David S. Stone
Jason Charles Spiro
Stone & Magnanini LLP
150 John F. Kennedy Parkway
4th Floor
Short Hills, NJ 07078

Wendy E. Miller
Cooper & Dunham LLP
1185 Avenue of the Americas
New York, NY 10036
*Attorneys for Plaintiff*

Stephen J. DeFeo
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
*Attorneys for Defendant*

      Re:   *Telebrands Corp. v. Grace Manufacturing, Inc.*
            Civil Action No. 10-2693 (WJM)

Dear Counsel:

    This matter comes before the Court on the motion by Defendant Grace Manufacturing, Inc. ("Grace") for a preliminary injunction to enforce a settlement

agreement entered into with Plaintiff Telebrands Corp. ("Telebrands"), or in the alternative, for summary judgment.  Oral argument was not held.  Fed. R. Civ. P. 78.  For the reasons stated below, Defendant's motion is **DENIED** in its entirety.

## I.     BACKGROUND

Plaintiff Telebrands is a direct marketing company engaged in the marketing and sale of consumer products including the PED EGG foot file (the "Ped Egg"), a device used to remove or reduce calluses.  (Plaintiff's Complaint, hereinafter "Cmplt.," ¶ 3).  Defendant Grace is a manufacturer and seller of personal care products including its own orb-shaped foot file sold under the trademark MICROPLANE (the "Microplane").  (*Id.* at ¶ 7).  The Microplane contains a blade made by a chemical etching process which is covered by U.S. patent number 5,100,506 (the "'506 patent") and owned by Grace.  (*Id.*).  Chemical etching is a commonly used method of creating blades; the '506 patent covers only a single specific etching process.  (*Id.* at ¶ 14).  While it is undisputed that the Ped Egg also contains a blade, the precise nature of that blade at varying points in time is at issue in this case.  (*Id.* at ¶ 14).

In May 2008, Grace filed a lawsuit in the Western District of Arkansas against two Telebrands customers, alleging violation of the '506 patent.  (*Id.* at ¶ 7; Defendant's Motion for Preliminary Injunction, hereinafter "Def. Br.," at 3).  Several days later, Telebrands filed a complaint against Grace in the District of New Jersey, seeking a declaratory judgment that the Ped Egg, as manufactured at that time, did not infringe upon the '506 patent.  (Cmplt. at ¶ 7; Def. Br. at 3).  Telebrands acknowledges that the Ped Egg manufactured at that time incorporated a chemically etched blade; however it maintains that it did not use the particular etching process contained in the '506 patent.  (Cmplt. at ¶ 14).

The two lawsuits were resolved in a settlement agreement (the "Agreement") dated December 4, 2008.  (Def. Br., Ex. A).  The plain language of the Settlement Agreement states the following in pertinent part: (1) Telebrands was required to cease manufacturing etched-blade Ped Eggs by February 1, 2009 (Paragraph 5a); (2) Telebrands was required to begin manufacturing a non-etched version of the Ped Egg by February 1, 2009 (Paragraph 5b); (3) Telebrands could continue selling and distributing "the Product" worldwide until December 31, 2011 (with "the Product" defined as the version of the Ped Egg that Telebrands was selling at the time of entry into the Agreement, *i.e.* the etched version)[1] (Paragraph 9c); (4) Telebrands would pay Grace royalties and licensing fees for its past and future use of Grace's intellectual property (Paragraphs 9b and 9c).  (*Id.* at ¶¶ 5a, 5b, 9b, 9c).  The meaning of Paragraph 9c is a major point of contention between the parties.  Telebrands argues that the paragraph means it has the right to continue selling off its inventory of previously made and acquired etched Ped Eggs until December 31, 2011.  (Cmplt. ¶ 17).  Grace counters that Paragraph 9c means only that Telebrands had the right to sell some version of the Ped

---

[1] Telebrands contends that "the Product" means the etched version and non-etched versions, despite also stating that it is "undisputed that at the time of the Settlement Agreement, Telebrands was selling *only* an etched PED EGG product."  Plaintiff's Opposition Brief at 4, n. 2 (emphasis added).

Egg up until December 31, 2011, and that Telebrands had to stop selling the etched version by February 1, 2009.  (Def. Br. at 5).  Grace's position appears to be tenuous at best, and indeed the language used by Grace in various places elsewhere in its briefs seems to contradict this view.  (Declaration of Christopher Grace in support of Motion for Preliminary Injunction, hereinafter "Grace Decl.," ¶ 14).  Regardless, the Court does not believe that resolution of this issue of contractual interpretation is necessary in order to rule on the pending motion and will not analyze it further at this time.

The terms of the settlement agreement also allowed Grace to inspect the plant in China where Telebrands manufactured its Ped Eggs, and Grace requested such an inspection.  (Def. Br., Ex. A, ¶ 5b).  As required by the Agreement, Telebrands agreed to allow Grace to inspect the plant during the next manufacturing run of the Ped Egg. (Cmplt. § 22).  In the interim, in late February or early March 2010, representatives of Grace and Telebrands met at Telebrands' third party warehouse, located in California, where Telebrands stored its stock of foot files made at the Chinese plant.[2]  (*Id.* at § 23). With Telebrands' consent, Grace obtained samples of the Ped Egg from the warehouse. (*Id.*).

After inspecting the samples, Christopher Grace, a Grace representative, informed Telebrands by letter that the Ped Eggs it had viewed contained chemically etched blades in violation of the Agreement.  (*Id.* at §§ 25-26).  However, Telebrands denies that the blades Grace inspected were chemically etched.  (*Id.* at § 27).  Telebrands argues that after February 1, 2009, it instructed its manufacturer to switch to a blade creation process using stamping instead of chemical etching.  (Plaintiff's Opposition Brief, hereinafter "Pl. Opp.," at 6, 15).  Stamping is a relatively common alternative process for creating blades. (*Id.* at 6).  Telebrands insists that to its knowledge, all Ped Eggs manufactured after that date contained only stamped, and not etched, blades.  (*Id.*).  In fact, Telebrands asserts that it had to switch subcontractors because the previous company it had used had etching capabilities only and that the new subcontractor has stamping capabilities only, such that the new blades could not possibly be etched.  (Declaration of Bob Wasyliw, hereinafter "Wasyliw Decl.," ¶ 6).  Telebrands also provided Grace with copies of the invoices from the manufacturer in China which state that the Ped Eggs located at the California warehouse contain stamped, not etched, blades.  (Cmplt. § 27).  Grace disagrees, insisting that the blades it inspected were etched and arguing that the language used in the invoices is erroneous and meaningless.  Telebrands has also reiterated its offer to allow Grace to inspect the manufacturing plant in China, but Grace has not responded.  (Cmplt. § 27).

After exchanging letters with Grace, Telebrands filed the present action with the district court, seeking a declaratory judgment that Telebrands has not breached the Agreement and the Ped Egg in its current form does not infringe the '506 patent.  (Cmplt.

---

[2] This inspection took place after the date by which all new Ped Eggs manufactured by Telebrands were required to contained non-etched blades only.  According to the plain language of the Agreement as well as by Telebrands' interpretation, at this point in time, Telebrands was still entitled to sell off its previously acquired inventory of Ped Eggs containing an etched blade (although Grace contests this).  Regardless, Telebrands appears to concede that the Ped Eggs stored at the California warehouse were all made subsequent to the February 1, 2009 manufacturing deadline and does not argue that these Ped Eggs were part of previously acquired inventory, which is why it is unnecessary to resolve the dispute over the meaning of the contract at this juncture.

¶¶ 33, 35).  In response, Grace has moved for a preliminary injunction to enforce the settlement agreement, or in the alternative, for summary judgment.  (Def. Br. at 2). Grace's motion is presently before the Court.

## II.   ANALYSIS
### A.   Preliminary Injunction Standard

The legal standard governing the grant of preliminary injunctive relief is well established. *See Fed. R. Civ. P. 65(a).*  Injunctive relief is an extraordinary remedy which should be granted only in limited circumstances and is at the district court's discretion. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 101-02 (3d Cir. 1988); *U.S. v. City of Philadelphia*, 644 F.2d 187, 191 n.1 (3d Cir. 1980).  In order to obtain this "ad interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of irreparable harm" if the injunction is not granted. *Frank's GMC Truck Center*, 847 F.2d at 102; *see Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1200-01 (Fed.Cir.2007).  Also pertinent to the court's review are the balance of the hardships and the public interest.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989); *see Abbott Labs.* at 1200-01.  Finally, it is the precedent of the Federal Circuit that applies to all patent law issues in a case, and the Federal Circuit that would have jurisdiction over any appeals.  *See Davis v. Brouse McDowell*, 596 F.3d 1355, 1359-62 (Fed. Cir. 2010); 28 U.S.C. § 1295(a)(1).

#### 1.   Likelihood of Success on the Merits

In order to demonstrate a likelihood of success on the merits, the moving party must prove its allegations by a preponderance of the evidence.  *See Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186 (3d Cir. 1990); *see also Tech Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 (Fed. Cir. 2008).  Here, Grace alleges that Telebrands has breached the terms of the Agreement by manufacturing or causing to be manufactured on its behalf etched versions of the Ped Egg foot file subsequent to the February 1, 2009 deadline for switching to the manufacture of a non-etched version.  (Def. Br. at 8).  However, the evidence and arguments that Grace puts forth in support of its position demonstrate at most a triable issue of fact and certainly do not indicate a likelihood of success on the merits; indeed, the evidence considered in its totality tends to suggest that Telebrands did not violate the Agreement.

The Agreement provides in pertinent part:

> 5a. By February 1, 2009, Telebrands… shall discontinue manufacturing, or causing to be manufactured on [its] behalf, the version of the Product currently being shipped to customers in the United States and which GM contends is covered by the claims of the '506 patent…(the "Current Blade Version").

> 6. Before and/or after February 1, 2009, Telebrands… shall manufacture or cause to be manufactured, import, export, sell, promote, advertise, market and/or

distribute a non-chemically etched blade version of the Product (the "Non-Etched Blade Version"). (Def. Br., Ex. A, ¶¶ 5a, 6).

The meaning of these two provisions of the Agreement as applicable here does not appear to be in dispute. Telebrands acknowledges that it was not permitted to manufacture or cause to be manufactured etched versions of the Ped Egg after February 1, 2009. (Pl. Opp. at 5). Furthermore, after that date it was required to manufacture and sell non-etched Ped Eggs.[3] (*Id.* at 5-6). However, Grace alleges that when it visited Telebrands' California warehouse, it was evident that the Ped Eggs it inspected contained etched blades in violation of the Agreement. (Def. Br. at 8, Grace Decl. ¶ 17).

In support of this contention, Grace has attached to its motion pictures of four blades found on foot files at the warehouse as well as a declaration from Christopher Grace stating that the blades are etched. (Def. Br., Ex. B-1). However, the pictures are blurry and Grace does not provide any information demonstrating how Christopher Grace was able to tell the blades were etched, what features visible in the pictures are unique to etched blades, or how the blades would appear differently had they been stamped and not etched. (*Id.*). It appears that Christopher Grace made his analysis based upon his inspection of the blades with the use of a magnifying glass only; it does not appear that he relied upon any outside tests or information. (*Id.*). His declaration also does not state what qualifications he possesses that enable him to conclude that the blades were etched without further testing. (*Id.*).

Telebrands is equally adamant that it has not breached the Agreement and that, to the best of its knowledge, all blades manufactured at its behest since February 1, 2009 have been stamped and not etched. (Pl. Opp. at 5-6, 12). Telebrands states after signing the Agreement, it entered into discussions with its manufacturer, Troika International Ltd. ("Troika") and developed an alternate blade for the Ped Egg that uses a stamping process. (*Id.* at 6). Stamping entails pressing a sheet of metal to create blades and, according to Telebrands, does not involve any chemical etching. (*Id.*). In further support of its position, Telebrands argues that after February 1, 2009,Troika changed subcontractors, because the previous subcontractor upon which it had relied had etching capabilities but not stamping. (Wasyliw Decl. ¶ 6). Telebrands also contends that the new subcontractor has stamping capabilities but not etching, making it impossible for the blades inspected by Grace to have been etched. (*Id.*). Telebrands has also provided the Court with copies of invoices that it previously supplied to Grace, which plainly state that the foot files manufactured at the factory in China and stored at the warehouse in California were made pursuant to a stamping process. (Cmplt. ¶ 27; Pl. Opp. At 6). Grace argues that this is irrelevant, because while the invoices may say stamped, this does not mean they were not etched, both because the invoices could be erroneously labeled and because stamped does not necessarily mean non-etched. (Def. Br. at 9). However, Grace does not provide any

---

[3] Note that the Agreement does not say Telebrands shall exclusively sell non-etched Ped Eggs after this date; however this may be Grace's interpretation. This interpretation contradicts with a later paragraph, paragraph 9, which appears to give Telebrands the right to sell etched Ped Eggs made and acquired prior to February 1, 2009 up until 2011. However, this dispute does not require resolution here.

further evidence calling into doubt the accuracy of the invoices. Telebrands has offered Grace the opportunity to inspect the plant directly, but Grace has not responded to this offer. (Cmplt. ¶ 27).

Considering the totality of the arguments and supporting evidence, it is clear that Grace has not demonstrated a likelihood of success on the merits. In fact, despite the photographs and assertions of Christopher Grace, the evidence appears to weigh heavily, although not conclusively, in support of a finding that Telebrands did not violate the Agreement. The only evidence that the newly produced Ped Eggs are etched comes from Christopher Grace, and Telebrands has countered with convincing evidence and arguments that the blades were not etched. Grace has demonstrated the existence of a question of fact but by no means a likelihood of prevailing on the merits. Therefore, the Court concludes that Grace is not entitled to a preliminary injunction.

### 2. Irreparable Harm

Even if Grace were able to demonstrate a likelihood of success on the merits, it would also have to demonstrate that it is likely to suffer irreparable harm if an injunction is not granted.[4] *See Instant Air*, 882 F.2d at 800 (3d Cir. 1989); *see also Abbott Labs.*, 473 F.3d at 1200-01. Grace is also unable to satisfy this requirement.

Grace contends that Telebrands' alleged manufacture of etched blades in violation of the Agreement has caused it to lose revenue and market share as well as to suffer price erosion. (Def. Br. at 9). It is well settled that a purely economic injury is compensable in money damages and therefore can never constitute irreparable harm. *Frank's GMC Truck Center*, 847 F.2d at 102-03. However, Grace argues that Telebrands' conduct has caused it to lose not only profits but also market share, which is difficult to compute rendering money damages insufficient, and which can constitute irreparable harm. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001).

Grace is correct that in certain circumstances, particularly in the patent context, loss of market share can constitute irreparable harm. *See id.* Nevertheless, it is not enough for Grace merely to allege loss of market share. *See Frank's GMC Truck Center*, 847 F.2d at 102-03; *Abbott Labs. v. Andrx. Pharm., Inc.*, 452 F.3d 1331, 1347-48 (Fed. Cir. 2006). Rather, the claimant must substantiate the allegation with some sort of factual support. *See Frank's GMC Truck Center*, 847 F.2d at 102-03 (moving party must adduce evidentiary proof to establish irreparable harm); *Illinois Tool Works, Inc. v. Grip-Pak*, 906 F.2d 679, 683 (Fed. Cir. 1990) (finding that a mere allegation of irreparable harm is insufficient because "acceptance of that position would require a finding of irreparable harm to every" patentee, regardless of circumstances). Here, Grace's only argument in

---

[4] Ordinarily, if a party is able to prove a strong likelihood of success on the merits in the first step of the preliminary injunction analysis, it is entitled to a rebuttable presumption of irreparable harm. *Reebok Int. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994). Here, however, Grace has not demonstrated a likelihood of success on the merits such that it has to prove irreparable harm. Moreover, any such presumption can be rebutted by evidence that the allegedly infringing behavior has ceased, the moving party has granted licenses under the patent, and the moving party has not diligently protected its rights. *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996). All three of these factors are present here and are discussed more thoroughly below.

support of its claim of irreparable harm is its statement that the purpose of the Agreement was to provide it with a window of time in which to establish itself as the preeminent maker of foot files. (Def. Br. at 9-10). However, Grace does not explain how it lost market share to Telebrands or provide any evidence that it attempted to intensify its marketing or boost it sales after entry into the Agreement. Grace's explanation falls short of the necessary substantiation and fails to convincingly demonstrate irreparable harm.

Moreover, the Federal Circuit has identified a variety of factors that, if present, militate against a finding of irreparable harm. *See Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996). These factors include evidence that (1) the non-moving party has or will soon stop the allegedly infringing behavior, such that an injunction is unnecessary; (2) the moving party has granted licenses under the patent, such that it is reasonable "to expect that invasion of the patent right can be recompensed with a royalty" rather than with an injunction; and (3) the moving party has delayed with respect to protecting its rights under the patent. *See id.*; *Reebok Int. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994).

Here, all three of these factors are present. First, Telebrands has provided evidence in the form of the invoices that it has ceased manufacturing etched Ped Eggs, rendering an injunction unnecessary. (*See* Def. Br., Ex. B-2). Second, Grace has granted Telebrands a license under the patent, demonstrating that any harm flowing from the use of Grace's intellectual property can be quantified and calculated as money damages. (*See* Def. Br., Ex. A, ¶¶ 3, 9a, 9b). Third, Grace has been dilatory with respect to protecting its rights under the patent. Even after submitting the letter to Telebrands alleging violation of the Agreement and patent infringement, Grace did not file a lawsuit. In fact, Grace only filed for the preliminary injunction presently at issue after Telebrands filed for a declaratory judgment, four months after discovering the allegedly infringing blades. There are also allegations that another Grace competitor, Revlon, may have infringed Grace's patent and that while Grace filed suit against Revlon, it did not move for a preliminary injunction. (Pl. Opp. at 10). Grace's conduct demonstrates a lack of urgency which belies its allegation of irreparable harm for which monetary damages would be insufficient. The Court finds that Grace has failed to demonstrate a probability of irreparable harm.

### 3.     The Balance of the Hardships and the Public Interest

Because Grace cannot satisfy the first two elements of the preliminary injunction standard, injunctive relief is plainly not warranted and the Court need not address the remaining considerations, namely the balance of the hardships and the public interest. *Polymer Technologies,* 103 F.3d at 973. Nevertheless, the Court will briefly state that while Grace convincingly argues that New Jersey public policy favors the settlement of litigation, such that enforcing a settlement agreement would also benefit the public interest, it has failed to present sufficient evidence that Telebrands violated the Agreement. (Def. Br. at 10-11). Therefore, there is no reason to believe that granting the injunction will support the public interest. For all of these reasons discussed above, the

Court concludes that a preliminary injunction is not warranted and Grace's motion is denied.

### B.    Summary Judgment Standard

In addition to seeking a preliminary injunction, Grace has moved for summary judgment in the alternative.  The standard for summary judgment is stricter than the standard for granting a preliminary judgment.  *See* Fed. R. Civ. P. 56(b).  Rather than demonstrating a mere likelihood of success on the merits, the moving party must demonstrate the absence of any material fact such that success on the merits is a certainty and a matter of law.  *See id.* (a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.")  As described above, Grace has at most demonstrated a triable issue of fact with respect to whether or not the settlement agreement has been violated and the '506 patent infringed.  Indeed, the evidence appears to weigh heavily in favor of finding that the Agreement was not breached, although this has not been established conclusively.  The Court finds that there remain unresolved issues of material fact such that a grant of summary judgment in Grace's favor is inappropriate at this juncture.  Grace's motion for summary judgment is denied.

### III.    CONCLUSION

For the reasons stated above, Grace's motion for a preliminary junction, or in the alternative, for summary judgment, is **DENIED**.  An appropriate order follows.


/s/ William J. Martini  
**WILLIAM J. MARTINI, U.S.D.J.**